Hasselrode, Appellant, v. Gnagey.

Argued October 4, 1960. Before JONES, C. J., MUS-MANNO, JONES, COHEN, BOK and EAGEN, JJ.

reargument refused July 28, 1961.

*Archibald M. Matthews,* with him *Edward O. Spotts,* and *Palmer & Elkins,* of the West Virginia Bar, for appellant.

*Joseph N. Cascio,* with him *Paul E. C. Fike,* and *Fike and Cascio,* for appellees.

OPINION BY MR. JUSTICE BENJAMIN R. JONES, June 26, 1961:

This appeal requires the construction and interpretation of a release given by an injured person in relinquishment of his claims for personal injury damages.

Fred L. Hasselrode (Hasselrode), on August 24, 1956, was a passenger in an automobile driven by Frank R. Carnegie (Carnegie) when it collided with a truck owned by William D. Gnagey trading as Gnagey Dairy Company (Dairy Company) and, as a result of this accident, Hasselrode sustained personal injuries. On December 19, 1956, Carnegie paid Hasselrode $1,518.87 and Carnegie received from Hasselrode a release reciting, inter alia, that he ". . . remised, released, and forever discharged, and by these presents do for myself, my heirs, executors and administrators and assigns, remise, release and forever discharge the said Frank R. Carnegie, his successors and assigns, and/or his, her, their and each of their associates, heirs, executors and administrators, and any and all other persons, associa-

tions and corporations, whether herein named or referred to or not, of and from any and every claim, demand, right, or cause of action, of whatsoever kind or nature, either in law or in equity, arising from or by reason of any bodily and/or personal injuries known or unknown sustained by me, and/or damage to property, or otherwise, as the result of a certain accident which happened on or about the 24th day of August, 1956, for which I have claimed the said Frank R. Carnegie to be legally liable, but this release shall not be construed as an admission of such liability."

On August 1, 1958, Hasselrode instituted a trespass action in the Court of Common Pleas of Somerset County against the Dairy Company for damages arising out of the accident. The Dairy Company joined Carnegie as an additional defendant and Carnegie, by way of answer, averred that he was discharged of any liability by reason of the release given him by Hasselrode. The Dairy Company answered the new matter pleaded by Carnegie and then amended its own answer to plead the release given by Hasselrode to Carnegie as a defense to Hasselrode's action against the Dairy Company. Hasselrode filed a reply averring that the release given to Carnegie was not intended to, nor did it, release the Dairy Company. The court below entered a judgment on the pleadings against Hasselrode and in favor of both the Dairy Company and Carnegie; from this judgment, Hasselrode now appeals.

Did the release given by Hasselrode to Carnegie effect a discharge of Hasselrode's claim against the Dairy Company?

The Uniform Contribution Among Tortfeasors Act[1] provides, inter alia: "A release by the injured person of one joint tortfeasor, whether before or after judgment, does not discharge the other tortfeasors *unless*

---

[1] Act of July 19, 1951, P. L. 1130, §4, 12 PS §2085.

*the release so provides,* but reduces the claim against the other tortfeasors in the amount of the consideration paid for the release or in any amount or proportion by which the release provides that the total claim shall be reduced if greater than the consideration paid". (Emphasis supplied) Did the instant release *"so provide"* a discharge of the Dairy Company by Hasselrode?

An examination of this release indicates its breadth and comprehension. By its terms, Hasselrode released not only Carnegie, but *"any and all"* other persons, associations and corporations regardless of whether they are named or referred to in the release. Not only are the persons released all inclusive but such persons are released of *"any and every"* claim or cause of action arising out of the accident of August 24, 1956. The intent of the parties must be gleaned from the language of the release; such language clearly and unequivocally shows the intent of the parties that Hasselrode was releasing his claims not only against Carnegie but against "any and all" persons, including the Dairy Company, involved in the accident of August 24, 1956.

In *Hilbert v. Roth,* 395 Pa. 270, 275, 149 A. 2d 648, Mr. Justice McBride, speaking for this Court, stated: "Hence we believe that in §4, the legislature quite reasonably enacted that such a release is not a discharge of other tortfeasors unless it *specifically* so states." The instant release measures up to the standard suggested in *Hilbert.* While the Dairy Company's name is not specifically set forth in this release, the release does provide that all persons whether specifically "named or referred to" therein are released from liability. The release could not and need not have been more specific and it was, therefore, not necessary to designate the Dairy Company therein.

Our examination of this release indicates that it meets the standard required by the Uniform Contribution Among Tortfeasors Act, supra, and that it effectu-

ated a release not only of Carnegie but also of the Dairy Company. No other result can logically be arrived at without torturing, misconstruing and, in effect, rewriting the language of the release given by Hasselrode to Carnegie.

Judgment affirmed.

Mr. Justice EAGEN dissents.

DISSENTING OPINION BY MR. JUSTICE MUSMANNO:

The purpose of law is to achieve justice; the purpose of language is to convey the meaning of the persons using it; the purpose of the courts is to plumb the depths of reality and on the unbudgeable foundation of established fact found a proper judgment. The record does not demonstrate that these three desiderata have found fulfillment in the case at bar. The following are the essentials in the matter. The plaintiff Fred L. Hasselrode was injured when the automobile in which he was a guest and being driven by a Frank R. Carnegie, was struck by a truck belonging to William D. Gnagey trading as Gnagey Dairy Company.

Desirous of discharging his obligations in the affair, Carnegie paid to Hasselrode the sum of $1518.87 and received from him a release discharging him from all liabilities predicated upon the accident.

At the time that Carnegie and Hasselrode entered into their negotiations and eventual agreement, nothing was said about the Dairy Company's responsibilities. There was no intention on the part of either of these two parties to immunize the Dairy Company from its liabilities. In fact the Dairy Company did not even know of the agreement made between Carnegie and Hasselrode and assuredly paid no part of the $1518.87 received by Hasselrode.

Later Hasselrode brought an action in trespass against the defendant Dairy Company charging it with negligence for causing the accident and claiming $10,-

000 damages. The Dairy Company joined Carnegie as an additional defendant, whereupon, by answer duly filed, Carnegie revealed that he was discharged of all liability in the controversy since he had made a settlement with Hasselrode. In support of that averment he attached to his answer a copy of the release given him by Hasselrode. The release provided, inter alia: "have remised, released, and forever discharged . . . FRANK R. CARNEGIE . . . and any and all other persons, associations and corporations, whether herein named or referred to or not, of and from any and every claim, demand, right, or cause of action of whatsoever kind or nature, either in law or equity, arising from or by reason of any bodily and/or personal injuries known or unknown . . . as the result of a certain accident which happened on or about the *24th* day of August, *1956*, for which I have claimed the said FRANK R. CARNEGIE to be legally liable, but this release shall not be construed as an admission of such liability." (Words capitalized and italicized were written, all other words printed.)

This agreement was a printed form, a stereotyped model used in paltry cases of settlement between potential creditors and debtors, involving no complicated details. The Dairy Company has seized upon the hackneyed language in the form to deny any responsibility to Hasselrode. In doing this, it takes a very audacious position. It knows very well that it did not pay a penny of the $1518.87 received by Hasselrode, it knows very well also that it in no way participated in the negotiations between Hasselrode and Carnegie. It knows, in addition, that its involvement in the accident was not referred to in the remotest fashion in the agreement. In short, the Dairy Company was as much a stranger to the agreement as if it had been negotiated by two persons in India.

Nevertheless, the Dairy Company claims that the agreement, to which and of which it was no part, has

now released it of all legal liability toward Hasselrode who was injured as the result of its negligence. In taking up this extraordinary position, the Dairy Company wants to reap where it did not sow, to build where it owns no land, to dance where it paid no fiddler, to milk where it fed no cow. Human nature being what it is, one can understand the boldness and cupidity of such a pretension, but what is surprising is that this Court, by its decision of today, in effect supplies the defendant with a stool and a pail to proceed with its unabashed milking operation.

The Majority Opinion makes no reference to the law of consideration. Is it not involved here? On what possible basis is the Gnagey Dairy Company allowed to carry away the milk, cream and butter of an agreement to which it contributed not a penny, not an effort, not even a thought? The Dairy Company is as much a foreigner to the agreement as if it had been absent on a trip to the moon at the time. Nor can it be stated that either of the parties to the agreement in any way represented the Dairy Company. Neither attempted to or could speak for the Dairy Company. How, then, I repeat, can the Dairy Company on any theory claim benefits in a transaction to which it was not even a passerby?

When Hasselrode and Carnegie met to discuss their mutual rights and liabilities arising out of the accident, they agreed that upon Carnegie's paying a certain amount to Hasselrode, Carnegie would be released of all obligations toward Hasselrode. If no document had been signed, the Dairy Company certainly could not have been released by any payment passing between Carnegie and Hasselrode. The fact that an incorrect paper was signed does not give the Dairy Company any rights higher than was intended between the contracting parties. Hasselrode and Carnegie used a form which was not applicable to their

situation. To that extent what they did was a mistake, as much a mistake as if they had, through an oversight, used a landlord-tenant printed form. Thus, Hasselrode has the right to show just what he and Carnegie had in mind when the printed release was signed.

Nothing can be clearer than the proposition that where a mistake is involved, all interested parties have the right to explain the nature of the mistake.

In *Hegmann v. Mitchell*, 179 Pa. Superior Ct. 123, 128, the Superior Court said: "The facts and circumstances existing at the time of the execution of the release are admissible to show what the parties had in mind where the language of the release is general in terms."

The defendant has at least the grace not to claim that it has done anything which entitles it to be released from a responsibility which attaches to every other vehicle owner involved in a serious accident. It seeks to take advantage of some stray words in the release which have no more relation to the defendant than the hieroglyphics on some prehistoric sarcophagus buried in the subterranean depths of Egypt.

It is not claimed by anyone that the Gnagey Dairy Company has done one single thing which entitles it to be released from a responsibility which attaches to every other vehicle owner involved in a serious accident. In spite of all this the Dairy Company, by its superficial appraisement of certain words in the agreement, by a failure to look beneath the moth-eaten phrases of that stereotyped form so as to ascertain the true intention of the parties, by a determination to take the advantage of the syllable and not the spirit, by letter and not by law, is now on the way to coming into a windfall to the extent of $10,000.

This is shocking not only because of the unjust enrichment of the defendant but because of the wrong it

inflicts upon the innocent Hasselrode, the victim of Gnagey's recklessness on the highway.

The Majority Opinion says: "The intent of the parties must be gleaned from the language of the release; such language clearly and unequivocally shows the intent of the parties that Hasselrode was releasing his claims not only against Carnegie but against 'any and all' persons, including the Dairy Company, involved in the accident of August 24, 1956."

With deferential respect I must observe that the release says nothing of the kind. Hasselrode nowhere said that he was releasing the Dairy Company. The Dairy Company was as far removed from the Hasselrode-Carnegie agreement as the cow which jumped over the moon. The Majority's reasoning is simply didactic, commanding and arbitrary. It is effective only because of the authority of the Court and not because any logic has been hauled into position to support its attack on freedom of contract. Nowhere is it suggested in the release by the remotest kind of argumentation, that Hasselrode is releasing the Dairy Company from its obligations.

In the assizes of logic, ethics and justice, the Dairy Company's position must fall, but in the realm of strict jurisprudence it has even less right to survive. At common law, a settlement with one tortfeasor discharged all tortfeasors whether they were mentioned or not in the settlement. The Legislature, after years of observation, noted the great hardships imposed by this rule. A victim of a tort might be willing to settle with the ostensible author of his woes, wholly ignorant that others also contributed to causing these woes. However, once he settled with a tortfeasor, no matter how meager the terms of settlement, he could not subsequently sue somebody else now proved to have been the major contributing cause to the untoward happening

which brought him to grief. To correct this obviously inequitable situation the Legislature enacted the Uniform Contribution Among Tortfeasors Act, Section 4 of which reads: "A release by the injured person of one joint tortfeasor, whether before or after judgment, does not discharge the other tortfeasors unless the release so provides, but reduces the claim against the other tortfeasors in the amount of the consideration paid for the release or in any amount or proportion by which the release provides that the total claim shall be reduced if greater than the consideration paid."

The Majority's position is that a release, no matter how general in language, no matter how loosely worded, whether it mentions any specific person or not, releases all tortfeasors. But this kind of construction upsets the whole purpose of the legislature, it nullifies the very intendment of the Act. In addition, it introduces disorder and irresponsibility into the whole subject of liabilities arising out of tort actions. A careful reading of Section 4 demonstrates vividly that the Legislature intended that a release, in order to discharge other potential tortfeasors in any particular accident, must specifically designate the identity of the tortfeasor who is to be released. The Act says that *the other* tortfeasor shall not be released "unless the release so provides." Who is the other tortfeasor in this case? The release in this case is as silent as the Dead Sea as to "the other tortfeasor."

But the Legislature did not stop with requiring identification of the "other tortfeasor." It specifically said that the other tortfeasor shall not be discharged of his responsibilities in the matter "unless the release so provides."

How shall the release "so provide?" Obviously in some manner which is clear—in some manner which appeals to one's understanding and common sense. The

release from Hasselrode to Carnegie did not provide for the release of the Dairy Company in any language which properly can be so interpreted.

It is astonishing to me how the defender of a position which has no solid foundation, and occupying a slippery terrain at best, will summon in support an argument which can only worsen the untenability of that position. Thus, the Majority Opinion cites the case of *Hilbert v. Roth*, 395 Pa. 270, 275, as ballast for its precarious footing. . It actually quotes from that decision a sentence which is its complete undoing. The Majority says: "In Hilbert v. Roth, 395 Pa. 270, 275, Mr. Justice McBRIDE, speaking for this Court, stated: 'Hence we believe that in §4, the legislature quite reasonably enacted that such a release is not a discharge of other tortfeasors unless it *specifically* so states.' The instant release measures up to the standard suggested in *Hilbert*." (Italics in Majority's Opinion.)

Where does Hasselrode agree *specifically* to exclude the Gnagey Dairy Company from its obligations rising out of the accident? In language as extensive as the universe, and as all-embracive as space, chronology, and prospect, the agreement releases "all" persons, associations and corporations from all claims, demands and causes "of whatever nature." Where is the *specificity*? Where is the identification? Where is the certainty which legal documents should import? The word "all", which the Majority argues is specific, is, in every dictionary in the world, the very *antithesis* of specific.

The agreement in question is not only not specific as to the Gnagey Dairy Company, but it is even vague as to the episode which is the subject of the agreement. It merely refers to "an accident which happened on or about the 24th day of August, 1956." (The nature of the accident is not even hinted at.) If the release had

included in its redundant verbiage the words "railroad companies," it would be absurd to argue that Hasselrode could not sue a railroad for injuries sustained by him while a passenger on a railroad train "on or about the 24th day of August, 1956."

As already stated, Hasselrode and Carnegie did not discuss the Dairy Company at all. In settling their differences, Hasselrode and Carnegie used, again as already indicated, a printed form in which, like the vapors supposedly surrounding the earth, everybody was included, but, with integrity as guide, can it fairly be concluded that the Dairy Company was released on the ground that the release *so provided*? Is the Dairy Company entitled to a free ride from a contract to which it was not a party, for which it paid no consideration, and was not even remotely considered by the actual parties to the contract?

If, as Hasselrode claims, it was the negligence of the driver of the Dairy Company's truck which caused the accident, on what principle of law and justice can the Dairy Company be released from liability when the release did not "so provide?" Could the Legislature have intended so illogical and unjust a result?

The most convincing proof that there was no intention between Hasselrode and Carnegie to release the Dairy Company resides in the admitted fact that the Dairy Company, as already stated, did not even know that the release had been signed.

In entering judgment for the defendants, the lower Court said that the: "Release was drawn and given under the Uniform Contribution Among Tortfeasors Act of July 19, 1959, P. L. 1130, 12 PS §§2082-2089." There is nothing in the record to support this conclusion. The release, as heretofore emphasized, was a printed form which said nothing about the Act of 1959, and certainly nothing about reducing the claims

"against the other tortfeasors in the amount of the consideration paid for the release, etc."

The only consolation I derive from the decision in this case is my belief that it cannot be long until the Legislature or this Court itself repudiates the illogical, untenable and unjust position advanced by the Majority which not only deprives the plaintiff of his day in Court, but entangles the Uniform Contribution Among Tortfeasors Act in such a manner that another decision will be necessary to unsnarl the imbroglio.